UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICHELLE UPTON, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| SMART ROOFS SOLAR INC., | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT AND JURY DEMAND

### PARTIES

1.      The Plaintiff, Michelle Upton ("Ms. Upton" or "Plaintiff"), is a female resident of Connecticut residing at 55 Cedar Hill Road, Milford, Connecticut 06461. Milford is in New Haven County.

2.      Defendant Smart Roofs Solar Inc. ("Smart Roofs" or the "Company") is incorporated under Connecticut law. Smart Roofs' principal office is located at 224 South Main Street, Newtown, Connecticut 06470. Newtown is in Fairfield County.

### JURISDICTION AND VENUE

3.      This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because Plaintiff has brought a claim pursuant to Title VII, 42 U.S.C. §2000e *et* seq., the federal Fair Labor Standards Act, 29 U.S.C. §201 *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq*. This court may exercise supplemental jurisdiction over the Plaintiff's state law claims. 28 U.S.C. §1367.

4.    This court has personal jurisdiction over the Defendant because the Defendant is a resident of the State of Connecticut.  Further, the Defendant has engaged in and transacted business in the State of Connecticut, including by managing and/or operating a business in Connecticut and/or employing the Plaintiff in Connecticut, and Plaintiff's causes of action stem largely from business transactions within the State of Connecticut.  Indeed, the Plaintiff was employed by the Defendant in the State of Connecticut, was managed by the Defendant in the State of Connecticut, and was terminated by the Defendant in the State of Connecticut.

## Statement of Facts

5.    Ms. Upton is a homosexual (lesbian) woman.

6.    Starting on or around November 13, 2018, Ms. Upton was hired by Smart Roofs as an Inside Sales Representative based in the Company's facility in Newtown, CT.

7.    Notably, at all relevant times, Ms. Upton worked at the Company's place of business and her job responsibilities included sales made by phone, over the internet, and/or by mail.

8.    At all relevant times, the Company was in an industry affecting commerce that employed 15 or more employees during 20 or more calendar weeks in each current and/or preceding calendar year.

9.    At all relevant times, the Company was an enterprise engaged in commerce because the Company had employees engaged in commerce or in the production of goods for commerce, and/or had employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for interstate commerce by any person.

10.    At all relevant times, the Company was an enterprise whose annual gross volume of sales made or business done was greater than or equal to $500,000.

11.     Additionally, at all relevant times during her employment by the Company, Ms. Upton was an employee who was engaged in interstate commerce or in the production of goods for interstate commerce. Indeed, during her employment by the Company, Ms. Upton regularly handled matters involving clients, financial transactions, and/or goods from states other than Connecticut and/or processed paperwork which involved financial transactions and matters across state lines. At all relevant times, Ms. Upton was a qualified employee and her job performance was satisfactory.

12.     Ms. Upton suffers from a number of mental conditions that constitute disabilities under the Americans with Disability Act ("ADA") and under Connecticut law.

13.     Ms. Upton's mental disabilities include generalized anxiety disorder and severe panic disorder.  As symptoms of these conditions, Ms. Upton periodically experiences sudden episodes of intense fear that trigger severe physical reactions, even when there is no real danger or apparent cause.

14.     These conditions, each individually and both collectively, substantially limit one or more major life activities, including but not limited to, Ms. Upton's sleeping, breathing, and her ability to socialize and be happy. These conditions, each individually and both collectively, also substantially impair one or more major bodily function, including but not limited to, Ms. Upton's neurological and/or brain functions. As such, both of these conditions are disabilities under the ADA and under Connecticut law.

15.     When Ms. Upton began her employment with the Company, she was the only woman working in the office.

16.     On or around November 13, 2018, when Ms. Upton began work, she immediately noticed that her direct supervisor, Paul Goldner ("Mr. Goldner"), and a coworker, Eric Kurtz

("Mr. Kurtz"), would regularly make discriminatory comments about women, as well as about individuals who identified as homosexual in terms of their sexual orientation.

17.     Upon information and belief, both Mr. Goldner and Mr. Kurtz are non-disabled heterosexual men.

18.     For example, Mr. Kurtz would publicly engage in conversations where he would refer to women as "bitches" and talk in detail about strip clubs, which was both inappropriate for the workplace and also made Ms. Upton feel extremely uncomfortable and harassed.

19.     At one point, Mr. Kurtz yelled across the room to loudly announce to Mr. Goldner what had happened at a strip club.

20.     Mr. Kurtz and Mr. Goldner would also regularly use derogatory terms related to homosexual individuals such as, but not limited to, "fag," "fairy," "carpet muncher," "dyke" and "homo."

21.     Mr. Goldner also engaged in a very public conversation with Mr. Kurtz about how he (Mr. Goldner) had been arrested and/or convicted of "rape" of a woman. They appeared to find this conversation funny.

22.     Ms. Upton was extremely disturbed and made to feel very uncomfortable by the ongoing harassing comments from Mr. Goldner and Mr. Kurtz that were clearly both threatening and discriminatory in nature toward women and homosexual individuals.

23.     On or around November 20, 2018, Ms. Upton emailed the Company's CEO and President, Joe Chenoweth ("Mr. Chenoweth"), who had originally hired her but had been on vacation (and not in the office) since her start date of November 13, 2018.

24.     Ms. Upton raised protected concerns to Mr. Chenoweth regarding the discriminatory comments that were being made regularly in the office, including the harassing and demeaning comments about women, strip clubs, and/or open talk about rape.

25.     Indeed, in her email expressing concerns to Mr. Chenoweth, Ms. Upton described the ongoing behavior in the office where employees were "referring to women as 'bitches,' talking about strip clubs and making jokes about 'being arrested for rape.'"

26.     Mr. Chenoweth completely disregarded Ms. Upton's protected concerns and brushed it off as mere "office chatter." Shockingly, he informed Ms. Upton that he was aware of the "noise level" in the office and suggested that she use noise cancelling headphones, seemingly to better ignore the harassing comments of her co-workers and managers.

27.     Upon information and belief, Mr. Chenoweth is a non-disabled, heterosexual man.

28.     Around the time that Ms. Upton began her employment, Mr. Goldner also indicated to Ms. Upton that the office employees (including Ms. Upton) shared the duties of cleaning the office. However, once Ms. Upton began working at the Company, it was clear that none of the male employees were participating in this so-called shared responsibility and these responsibilities were left for the female Ms. Upton to complete.

29.     Notably, it was originally communicated to Ms. Upton that her scheduled shift would be from 8:00 a.m. to 4:00 p.m., Monday through Friday. With the additional responsibilities of cleaning the office, Ms. Upton found it necessary to arrive at the office early (approximately two to three hours) to complete the necessary tasks of opening the office, disarming the alarm system, taking out the trash, cleaning the office bathrooms, and vacuuming the office floors.

30.     Despite Ms. Upton's job title of Inside Sales Representative, Ms. Upton routinely performed duties outside of those typically associated with an inside sales representative position (selling products or services).

31.     Furthermore, throughout Ms. Upton's employment, Ms. Upton's commission-based compensation did not equal more than half of her total pay.

32.     In fact, Ms. Upton routinely worked more than 40 hours per week despite receiving no additional compensation for this because she was (falsely) classified as an overtime exempt employee due to her (improper) classification as an inside sales employee.

33.     The Company knew that Ms. Upton worked more than 40 hours per week and suffered and permitted her to do so.  Indeed, Ms. Upton's volume of work (and the hours such work took) were directed by the Company.

34.     Around this same time, Ms. Upton raised protected concerns to Mr. Goldner and Mr. Chenoweth regarding the Company's improper pay practices, including the Company's improper failure to pay her overtime when she worked more than 40 hours.

35.     In or around the week of November 26, 2018, Ms. Upton disclosed her diagnosed disabilities to Mr. Chenoweth in a conversation. She indicated that she had occasionally experienced panic attacks and that she regularly took anxiety medication to help mitigate her disability symptoms. Indeed, she conveyed how she responded worse to stressful situations (such as loud noises or aggressive behavior) due to her diagnosed disabilities.

36.     In or around December 2018, Ms. Upton raised protected concerns again to Mr. Chenoweth about the ongoing discriminatory and harassing comments from Mr. Goldner and Mr. Kurtz about women and related to individuals who identify as homosexual.

37. In response, Mr. Chenoweth told Ms. Upton "oh, he [Mr. Goldner] is just an old Jew."

38. Ms. Upton was shocked by this response, as it not only failed to take her concerns seriously, but also was clearly made in a discriminatory, anti-Semitic manner (or else a manner that indicated that Mr. Chenoweth believed that because Mr. Goldner was Jewish, it was either inevitable or excusable that Mr. Goldner was engaging in harassing behavior). Furthermore, Mr. Chenoweth failed to take any action to address Ms. Upton's very serious concerns.

39. In or around early December 2018, after Mr. Chenoweth had failed to respond in a meaningful manner to Ms. Upton's protected concerns and had failed to address the ongoing discriminatory comments being made in the office, Ms. Upton decided to take further action to try to stop the harassing behavior.

40. At this point, Ms. Upton disclosed her homosexual sexual orientation to both Mr. Kurtz and Mr. Goldner and raised protected concerns about their ongoing discriminatory comments concerning women and homosexual individuals. She clearly conveyed that these harassing comments made her very uncomfortable and asked that they stop immediately.

41. Following the disclosure of her sexual orientation and her raising of protected concerns to Mr. Goldner, Mr. Goldner began to further discriminate and retaliate against Ms. Upton.

42. Indeed, Ms. Upton noticed that Mr. Goldner began to reassign her clients (which were initially assigned based on territory and/or geographical location) in the online customer management system to Bernie Cohen ("Mr. Cohen").

43. Upon information and belief, Mr. Cohen is a heterosexual, male employee.

44. It was clear that Mr. Goldner was reassigning Ms. Upton's clients for discriminatory and/or retaliatory reasons.

45. Shortly after Ms. Upton disclosed her sexual orientation to Mr. Kurtz and Mr. Goldner, they began asking her harassing questions concerning her sexual orientation, including her female partner, such as "which one of you is the man" and "have you ever been with a man."

46. At one point around this time, Mr. Goldner asked Ms. Upton if her partner and her had ever made a sexually explicit video tape and if they "used sex toys."

47. Ms. Upton was extremely uncomfortable with these comments and she clearly conveyed this through her body language and statements. Indeed, she raised protected concerns by noting that she found these comments to be both sexually harassing and discriminatory.

48. Based on Ms. Upton's gender and sexual orientation, Mr. Goldner continued to periodically harass Ms. Upton by invoking stereotypes sometimes utilized in pornographic films about two women engaging in sexual activity together in order to provide pleasure for men.

49. In or around late December 2018 or early January 2019, Ms. Upton answered a phone call from her partner, Stormy Ryan ("Ms. Ryan"), and Mr. Goldner overheard her mention Ms. Ryan's first name (Stormy).

50. Following this phone call, Mr. Goldner mockingly asked Ms. Upton if her partner's name was "Stormy Daniels," a well-known public figure who is a pornographic film actress and stripper. He proceeded to ask Ms. Upton if her partner "danced for money."

51. Ms. Upton informed Mr. Goldner that this harassing comment was extremely insulting to her and made her very uncomfortable.

52. It was abundantly clear that Mr. Goldner was making these statements in a sexually harassing manner that was discriminatory both based on Ms. Upton's gender as a

woman, as well as her failure to conform to traditional notions of female gender, that is, not being attracted to men and/or discriminatorily based on her sexual orientation (homosexual).

53.     Following this incident, Mr. Goldner would periodically comment in a harassing manner about Ms. Upton's partner's name (Stormy) and regularly referred to her as Stormy Daniels.

54.     Indeed, at one point, Mr. Goldner referred to Ms. Upton's partner as Stormy Daniels with a lewd smirk on his face that clearly conveyed the fact that he was well aware these comments were inappropriate as well as sexually harassing. Ms. Upton raised protected concerns about these sexually harassing comments and informed him that she was incredibly insulted by these statements.

55.     On or around January 22, 2019, Ms. Upton texted Mr. Goldner and raised protected concerns about the very serious ongoing harassment, retaliation, and/or discrimination due to her gender and/or sexual orientation.

56.     Indeed, she requested that Mr. Goldner "address all the gay comments Eric [Mr. Kurtz] makes…" and that "everyone has a right to feel comfortable [in the office], and every time I'm in the office he has something to say about gay people or a gay comment." She explicitly noted, "It's a form of harassment and I need that to end today."

57.     On or around January 23, 2019, Mr. Goldner indicated that he wanted to speak with Ms. Upton privately. He refused to commit to stopping his harassment and instead stated that Mr. Kurtz's father was homosexual.

58.     Ms. Upton was shocked, as Mr. Goldner seemed to be suggesting that Mr. Kurtz's father's sexual orientation somehow excused the ongoing harassment, retaliation, and/or discrimination that she had been experiencing.

59. At this point, Ms. Upton again raised protected concerns to Mr. Goldner and clearly indicated that she was being harassed and discriminated against due to her gender and sexual orientation and that Mr. Goldner's behavior was unacceptable.

60. However, Mr. Goldner refused to meaningfully address Ms. Upton's protected concerns further.

61. Following this interaction, Mr. Goldner treated Ms. Upton in a more hostile manner. For example, Mr. Goldner would periodically raise his voice at Ms. Upton in an aggressive manner during workplace interactions.

62. Notably, he did not treat male employees, heterosexual employees, and/or employees who had not engaged in protected concerns, in such an aggressive manner.

63. For instance, on or around February 13, 2019, Mr. Goldner curtly told Ms. Upton that she was no longer allowed to speak to people at the office. He demanded that she sit in "her corner" and "isolate" herself.

64. Mr. Goldner further told Ms. Upton that he was allowed to say, "whatever he wanted to whoever he wanted."

65. Ms. Upton was shaken by this incident, as it was very obvious from Mr. Goldner's tone and statements both that Ms. Upton was being targeted in retaliation for having expressed protected concerns and that Mr. Goldner had no intention of stopping his harassment.

66. On or around February 13, 2019, Ms. Upton emailed Mr. Chenoweth, the CEO, and raised protected concerns about Mr. Goldner's ongoing harassing, discriminatory, and retaliatory behavior. Ms. Upton explained that the behavior made her "uncomfortable" and the environment was "increasingly becoming more toxic."

67.    On or around May 31, 2019, Mr. Goldner threateningly informed Ms. Upton, "none of the discussions better fucking get out there again or there will be real fucking trouble this time."

68.    Indeed, this was clearly in reference to Ms. Upton raising protected concerns about Mr. Goldner to Mr. Chenoweth.

69.    That same day, Ms. Upton emailed Mr. Chenoweth and raised further protected concerns about the threatening statements made by Mr. Goldner in retaliation against her earlier expressions of protected concerns. Again, however, there was no meaningful response made to Ms. Upton's protected concerns.

70.    In or around the Summer of 2019, Mr. Chenoweth and Ms. Upton were having a casual conversation in which she mentioned that her partner (Ms. Ryan) was an EMT. In response, Mr. Chenoweth stated "all EMTs are lesbians."

71.    Ms. Upton was stunned by this clearly discriminatory statement which was obviously based on stereotypes about homosexual women.

72.    In or around mid-September 2019, a new general manager, Anthony Conklin ("Mr. Conklin"), started at the office. Upon information and belief, Mr. Conklin is a non-disabled, heterosexual man.

73.    Around this same time, Mr. Conklin gave Mr. Goldner an outside sales position and Fred Troy ("Mr. Troy"), was brought in as Ms. Upton's new supervisor (and Mr. Goldner's replacement).

74.    Upon information and belief, Mr. Troy is a non-disabled, heterosexual man.

75.     In or around late September 2019, during Mr. Troy's first few weeks with the Company, Ms. Upton mentioned to him that she suffered from an anxiety condition and was sensitive to loud noises due to her diagnosed disability.

76.     Indeed, because Ms. Upton conveyed how she responded worse to stressful situations (such as loud noises or aggressive behavior) due to her diagnosed disabilities, it was clear that Ms. Upton was conveying a request for the reasonable disability-related accommodation of not being subjected to aggressive or loud yelling at the workplace.

77.     Ms. Upton and Mr. Troy further discussed how Ms. Upton was prescribed anxiety medication to mitigate these disability-related symptoms.

78.     Mr. Troy appeared concerned when Ms. Upton disclosed her disability.

79.     Upon information and belief, Mr. Goldner or others at the Company disclosed to Mr. Troy that Ms. Upton had previously expressed discrimination and harassment complaints related to her treatment by management and/or that Ms. Upton was a homosexual woman.

80.     On or around October 24, 2019, Mr. Troy became angry during a casual conversation with Ms. Upton. Mr. Troy's aggression and threatening demeanor was clearly conveyed through his body language, tone, and words.

81.     Notably, Ms. Upton had done nothing wrong to warrant this type of reaction and she thought his behavior was very disturbing.  Indeed, Mr. Troy did not treat the non-disabled, heterosexual, or male employees in this manner.

82.     On or around October 25, 2019, Mr. Troy again raised his voice at Ms. Upton during a meeting. At this point, it was clear that Mr. Troy's treatment of Ms. Upton was discriminatory in nature and/or based on the fact that she was disabled and/or a homosexual woman.

83. Ms. Upton raised protected concerns to Mr. Troy about his harassing behavior. In response, Mr. Troy grew angrier and, as Ms. Upton tried to leave the uncomfortable situation, he aggressively tried to follow her.

84. On or around October 25, 2019, Ms. Upton texted Mr. Chenoweth and raised protected concerns about the discrimination that she was experiencing from Mr. Troy.

85. Notably, Ms. Upton mentioned the harassment and discrimination that she had experienced with Mr. Goldner previously in hopes of conveying the very serious nature of her protected concerns.

86. Mr. Chenoweth did not respond.

87. On or around October 25, 2019, Ms. Upton contacted Mr. Chenoweth to raise protected concerns again. She specifically indicated that "due to my medically diagnosed Severe Panic Disorder and Generalized Anxiety Disorder, I react to stressful or frightening situations differently than others."

88. Indeed, Ms. Upton conveyed the fact that she was requesting the reasonable disability-related accommodation of being spoken to in a calm, normal volume due to her diagnosed disabilities because her symptoms were worsened by aggressive behavior or loud noises (such as yelling).

89. Ms. Upton also described that "[she] was shamed for being gay" and "[she] was harassed." Ms. Upton further emphasized that "Fred does not like me… [m]aybe because I'm gay[.]"

90. In response, Mr. Chenoweth brushed off Ms. Upton's concerns. He instead dismissively told Ms. Upton that she was "a few cans short," but "that's the way god made you," which was a clearly discriminatory reference to Ms. Upton's disability.

91.    Based on Mr. Chenoweth's lack of a meaningful response (and his discriminatory comment), it was clear that he was not taking Ms. Upton's concerns seriously.

92.    Ms. Upton indicated at this point that she was very serious about her concerns and did not feel comfortable returning to the office until Mr. Chenoweth had responded in some way to the very serious issues that she was raising.

93.    Mr. Chenoweth responded by telling Ms. Upton that she could take Monday and Tuesday off of work and that she should let him know what she wanted to do by the end of Tuesday.

94.    On or around the morning of October 28, 2020, Ms. Upton again raised protected concerns to Mr. Chenoweth and stated, "I sent you a formal complaint as to why I do not feel safe in the workplace. I expressed a detailed account as to why. I reminded you, again, that I was medical diagnosed with Severe Panic Disorder and Generalized Anxiety Disorder. In no way did you address my very serious concerns. Instead you made the conscious decision to dismiss them while blatantly making fun of my disabilities." Ms. Upton further added, "I've been victimized by my direct superiors at [the Company] since November of last year. I never thought you'd do the same as the CEO."

95.    In response to Ms. Upton's email raising protected concerns, on or around the morning of Monday, October 28, 2019, Mr. Chenoweth abruptly thanked Ms. Upton for her time with the Company and made clear that her employment was over.

96.    Indeed, it was abundantly clear that Mr. Chenoweth was terminating Ms. Upton's employment with the Company.

97.    Ms. Upton was shocked by Mr. Chenoweth's response, and replied, "I never said I quit" and emphatically added, "I feel unheard, sad, not taken seriously and utterly defeated…

I've said everything I could to be heard and even now, am still trying to make you actually hear me… dealing with the constant harassment and abuse by [Mr. Goldner] for the better part of my time [at the Company]."

98.    Ms. Upton emphasized Mr. Chenoweth's failure to acknowledge and/or respond to her protected concerns and noted, "Everything I've said to you, from last November about [Mr. Goldner], to last weeks emails about [Mr. Troy], seemingly fell on deaf ears."

99.    On or around Monday, October 28, 2019, due to Mr. Chenoweth's discriminatory and/or retaliatory responses to Ms. Upton's protected activities, Ms. Upton contacted Jessica Feliciano ("Ms. Feliciano") from the Company's Human Resources department and reiterated her protected concerns.

100.    Ms. Upton further indicated that she was very uncomfortable in the workplace due to the ongoing severe harassment and discrimination and further added, "I did not quit" but relayed that she was unsure of her employment status due to the ongoing treatment she had been subjected to.

101.    Indeed, Ms. Upton communicated that she was "giving up on Joe Chenoweth doing anything to resolve the issue, just as he did nothing to resolve [the] abuse, harassment, gay bashing, and blatant bullying [her] last superior, Paul Goldner, inflicted upon [her]…."

102.    Ms. Upton further described how Mr. Chenoweth mocked her disability and how she had raised protected concerns to Mr. Chenoweth about being relentlessly "harassed, gay bashed and verbally abused by [her] former manager" but had received no meaningful response from Mr. Chenoweth.

103.    Indeed, Ms. Upton noted, "Not only did the CEO, [Mr. Chenoweth], not address my serious concerns, but he also made fun of my disabilities. Knowing I suffer from medically

diagnosed Severe Panic Disorder and Generalized Anxiety Disorder, even reminding him of this in my initial [October 25, 2019] email… he did not address my concerns about [Mr. Troy], but seemingly dismissed them."

104.    That same day, October 28, 2019, Ms. Upton attempted to log onto the online work system, but her account was disabled.

105.    On or around October 30, 2019, Ms. Upton completed and submitted a formal complaint to Ms. Feliciano in human resources as requested. Notably, Ms. Upton stated, "I was harassed, gay-bashed, and bullied by him and a coworker, threatened, and otherwise. Beginning my first week there, I emailed [Mr. Chenoweth] numerous concerns regarding what I was dealing with within the office. [Mr. Goldner] remained my direct supervisor, and the abuse continued…. It was a toxic environment, and I made [Mr. Chenoweth] aware of everything via emails and direct conversations with [Mr. Chenoweth]."

106.    Ms. Upton further detailed the incident she experienced with Mr. Troy and reiterated that she raised protected concerns during that altercation by stating to Mr. Troy, "Maybe you hate me because I'm gay."

107.    Ms. Upton concluded by detailing her conversation with Mr. Chenoweth where she reiterated her very serious protected concerns but noted that "he never addressed [her] concerns…."

108.    On or around October 31, 2019, Ms. Upton continued her conversation with human resources, but conveyed that she was considering finding an attorney and, as such, pursuing her legal rights in this matter.

109.    On or around November 6, 2019, Ms. Upton was contacted by another employee and informed that there had been an official announcement that she was no longer employed with the Company.

110.    Notably, Ms. Upton also received a termination letter soon thereafter where her termination date was listed as November 12, 2019 and the reason given for her termination was "proving a false claim for investigation."

111.    As such, Ms. Upton was involuntarily terminated.

112.    Indeed, based on the reason given for Ms. Upton's termination, it was clear that she was fired for raising protected discrimination and harassment concerns.

113.    Upon information and belief, Ms. Upton was replaced by a non-disabled, heterosexual man.

114.    In February 2020, Ms. Upton timely filed a Charge of Discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO") (Charge No. 2020376), which was cross filed with the United States Equal Employment Opportunity Commission ("EEOC") (Charge No. 16A-2020-00681).

115.    The Company was named as Respondent in this charge.

116.    On or around August 13, 2020, Ms. Upton notified the CHRO of her intent to file a complaint in Federal District Court and/or Superior Court and, accordingly, requested that the CHRO release jurisdiction and permit Ms. Upton to file in Federal District Court and/or Superior Court.

117.    On or around August 28, 2020, the CHRO issued a release of jurisdiction to Ms. Upton.

118. On or around September 4, 2020, the EEOC provided Ms. Upton with a Notice of a Right to Sue letter.

119. This lawsuit is timely filed.

## COUNT I

**(Sexual Harassment and Sex Discrimination in Violation of Conn. Gen. Stat. § 46(a)-60))**

**Ms. Upton v. Defendant**

120. Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

121. The Company is an employer under the definitions applicable to Conn. Gen. Stat. § 46a-60 because the Company employed three or more persons.

122. The Company, by and through its agents, including, but not limited to, Mr. Chenoweth, Mr. Goldner, Mr. Kurtz, and/or Mr. Troy, sexually harassed and discriminated against Ms. Upton with respect to her compensation, terms, conditions, and/or privileges of employment, because of Ms. Upton's sex and/or because Ms. Upton failed to conform to sexual and/or gender stereotypes, including related to the way that women should act, dress, and comport themselves with regard to men.

123. More specifically, the Defendant subjected Ms. Upton to adverse actions, including, but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, yelling, loud noises, and/or aggressive behavior, and the termination of Ms. Upton's employment because she was a woman, and/or because she was a woman who was also homosexual ("sex plus" discrimination), and/or because she was a woman who refused to accept, engage in, or reciprocate sexual harassment and/or refused to accept a sexually harassing and hostile work environment.

124.    Defendant's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Upton and/or conduct so reckless to amount to such disregard.  As a direct and proximate result of the Defendant's violations of Conn. Gen. Stat. § 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

125.    Ms. Upton seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

## COUNT II

### (Sexual Harassment and Sex Discrimination in Violation of Title VII, 42 U.S.C. §§2000e, et. seq.)

### Ms. Upton v. Defendant

126.    Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

127.    During all relevant times, the Company was an employer under Title VII, 42 U.S.C. §§2000e, et. seq. (hereinafter "Title VII") because it employed more than 15 persons for 20 or more calendar weeks within the previous 12-month period.

128.    The Company, by and through its agents (including but not limited to, Mr. Chenoweth, Mr. Goldner, Mr. Kurtz, and/or Mr. Troy), sexually harassed, otherwise harassed, and discriminated against Ms. Upton with respect to her compensation, terms, and/or the

conditions or privileges of her employment because of Ms. Upton's sex, and/or because Ms. Upton was a woman who was also homosexual ("sex plus" discrimination), and/or because Ms. Upton failed to conform to sexual and/or gender stereotypes.

129. More specifically, the Company subjected Ms. Upton to adverse actions, but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, yelling, loud noises, and/or aggressive behavior, and the termination of Ms. Upton's employment because she is a woman, because she was a homosexual woman, and/or because she was a woman who refused to accept, engage in, or reciprocate sexual harassment and/or refused to accept a sexually harassing and hostile work environment.

130. Furthermore, the Company subjected Ms. Upton to adverse actions, but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, yelling, loud noises, and/or aggressive behavior, and the termination of Ms. Upton's employment because Ms. Upton was a woman who was also homosexual ("sex plus" discrimination), and/or because Ms. Upton failed to conform to sexual and/or gender stereotypes.

131. As a direct and proximate result of the Company's violation of Title VII, Ms. Upton has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

132. Defendant acted with malice and/or with reckless indifference to the federally protected rights of Ms. Upton.

133. Ms. Upton seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not

limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

## COUNT III

### (Sexual Orientation Discrimination in Violation of Title VII, 42 U.S.C. §§2000e, et. seq.)

### Ms. Upton v. Defendant

134.   Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

135.   The Company, by and through its agents (including but not limited to, Mr. Chenoweth, Mr. Goldner, Mr. Kurtz, and/or Mr. Troy), sexually harassed, otherwise harassed, and discriminated against Ms. Upton with respect to her compensation, terms, and/or the conditions or privileges of her employment because of Ms. Upton's sexual orientation, because Ms. Upton was a homosexual woman, and/or because Ms. Upton failed to conform to sexual and/or gender stereotypes.

136.   More specifically, the Company subjected Ms. Upton to adverse actions, including but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, and the termination of Ms. Upton's employment because of Ms. Upton's sexual orientation and/or because Ms. Upton failed to conform to sexual and/or gender stereotypes.

137.   Furthermore, the Company subjected Ms. Upton to adverse actions, but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, yelling, loud noises, and/or aggressive behavior, and the termination of Ms. Upton's employment

because of Ms. Upton's sexual orientation and/or because Ms. Upton failed to conform to sexual and/or gender stereotypes.

138.    As a direct and proximate result of the Company's violation of Title VII, Ms. Upton has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

139.    Defendant acted with malice and/or with reckless indifference to the federally protected rights of Ms. Upton.

140.    Ms. Upton seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

## COUNT IV

### (Sexual Orientation Discrimination in Violation of Conn. Gen. Stat. § 46(a)-81)

### Ms. Upton v. Defendant

141.    Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

142.    Ms. Upton is a gay (homosexual) woman and at all relevant times, the Defendant was aware of Ms. Upton's sexual orientation.

143.    Defendant, including the Company by and through its agents, harassed and discriminated against Ms. Upton with respect to the compensation, terms, conditions, and/or

privileges of her employment because of Ms. Upton's sexual orientation and/or because she was a homosexual woman ("sexual orientation plus" discrimination).

144. More specifically, the Defendant subjected Ms. Upton to adverse actions, but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, yelling, loud noises, and/or aggressive behavior, and the termination of Ms. Upton's employment because of Ms. Upton's sexual orientation and/or because she was a homosexual woman.

145. Defendant's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Upton and/or conduct so reckless to amount to such disregard.

146. As a direct and proximate result of the Defendant's violations of Conn. Gen. Stat. § 46-81, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

147. Ms. Upton seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

## COUNT V

**(Disability Discrimination and Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.*)**

### Ms. Upton v. Defendant

148. Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

149. Ms. Upton suffers (and all relevant times suffered) from disabilities, including generalized anxiety disorder and severe panic disorder. As symptoms of these conditions, Ms. Upton periodically experiences sudden episodes of intense fear that triggers severe physical reactions, even when there is no real danger or apparent cause.

150. These conditions, each individually and both collectively, substantially limit one or more major life activities, including but not limited to, Ms. Upton's sleeping, breathing, and her ability to socialize and be happy. These conditions, each individually and both collectively, also substantially impair one or more major bodily function, including but not limited to, Ms. Upton's neurological and/or brain functions. As such, Ms. Upton is (and at all relevant times was) disabled under the ADA.

151. At all relevant times, Ms. Upton was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

152. Ms. Upton disclosed her disabilities to Defendant and/or Defendant were aware of Ms. Upton's disabilities and/or Defendant regarded Ms. Upton as disabled.

153. Ms. Upton requested disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job. These requested reasonable accommodations included, but were not limited to: (i) not being subjected to aggressive or loud yelling at the workplace.; and (ii) being spoken to in a calm, normal volume due to her diagnosed disabilities, wherein her symptoms were worsened by aggressive behavior or loud noises (such as yelling).

154. Defendant failed to engage in an interactive dialogue related to some or all of Ms. Upton's reasonable accommodation requests.

155.    Ms. Upton's requested disability-related accommodations did not pose an undue burden on Defendant.

156.    Defendant failed to provide Ms. Upton with one or more reasonable accommodations that she requested and/or that would have assisted her in performing the essential functions of her job and/or would have allowed her to perform the essential functions of her job without experiencing significant pain or discomfort.

157.    Defendant discriminated against Ms. Upton due to her disabilities by subjecting Ms. Upton to adverse actions, but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, yelling, loud noises, and/or aggressive behavior, and the termination of Ms. Upton's employment.

158.    Upon information and belief, the Company replaced Ms. Upton with a lesser or similarly qualified, non-disabled employee.

159.    Defendant acted with malice and/or with reckless indifference to the federally protected rights of Ms. Upton.

160.    As a direct and proximate result of Defendant's violation of the ADA, Ms. Upton has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

161.    Ms. Upton seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish,

loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

## COUNT VI

### (Disability Discrimination in Violation of Conn. Gen. Stat. § 46(a)-81)

### Ms. Upton v. Defendant

162.    Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

163.    Ms. Upton suffers (and all relevant times suffered) from disabilities, including generalized anxiety disorder and severe panic disorder.  As symptoms of these conditions, Ms. Upton periodically experiences sudden episodes of intense fear that triggers severe physical reactions, even when there is no real danger or apparent cause.

164.    These conditions, each individually and both collectively, substantially limit one or more major life activities, including but not limited to, Ms. Upton's sleeping, breathing, and her ability to socialize and be happy. These conditions, each individually and both collectively, also substantially impair one or more major bodily function, including but not limited to, Ms. Upton's neurological and/or brain functions. As such, Ms. Upton is (and at all relevant times was) disabled under Conn. Gen. Stat. § 46(a)-81.

165.    At all relevant times, Ms. Upton was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

166.    Ms. Upton disclosed her disabilities to Defendant and/or Defendant were aware of Ms. Upton's disabilities and/or Defendant regarded Ms. Upton as disabled.

167.    Ms. Upton requested disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job.  These requested reasonable accommodations included, but were not limited to: (i) not being subjected to aggressive or loud yelling at the workplace.; and (ii) being spoken to in a calm, normal volume due to her diagnosed disabilities, wherein her symptoms were worsened by aggressive behavior or loud noises (such as yelling).

168.    Defendant failed to engage in an interactive dialogue related to some or all of Ms. Upton's reasonable accommodation requests.

169.    Ms. Upton's requested disability-related accommodations did not pose an undue burden on Defendant.

170.    Defendant failed to provide Ms. Upton with one or more reasonable accommodations that she requested and/or that would have assisted her in performing the essential functions of her job and/or would have allowed her to perform the essential functions of her job without experiencing significant pain or discomfort.

171.    Defendant discriminated against Ms. Upton due to her disabilities by subjecting Ms. Upton to adverse actions, including, but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, yelling, loud noises, and/or aggressive behavior, and the termination of Ms. Upton's employment.

172.    Upon information and belief, the Company replaced Ms. Upton with a lesser or similarly qualified, non-disabled employee.

173.    Defendant's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Upton and/or conduct so reckless to amount to such disregard.

174.    As a direct and proximate result of Defendant's violation of Conn. Gen. Stat. § 46(a)-81, Ms. Upton has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

175.    Ms. Upton seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

## COUNT VII

### (Retaliation in Violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*)

### Ms. Upton v. Defendant

176.    Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

177.    Ms. Upton engaged in protected activity under Title VII, including, opposing, voicing protected concerns, and/or engaging in other protected activity related to concerns regarding the sexually harassing and discriminatory actions of Company employees and/or by voicing protected concerns regarding the Company's failure to investigate and/or failure to take measures to appropriately address, and/or inappropriate response related to Ms. Upton's expression of concerns regarding, the sexually harassing behavior of its employees.

178.    Ms. Upton further engaged in protected activity under Title VII, including, opposing, voicing protected concerns, and/or engaging in other protected activity related to

concerns regarding discrimination based on Ms. Upton's sex, and/or because Ms. Upton was a woman who was also homosexual ("sex plus" discrimination), and/or because Ms. Upton failed to conform to sexual and/or gender stereotypes.

179.     The Company retaliated against Ms. Upton for engaging in protected activity, including, but not limited to, the aforementioned protected activity, by subjecting Ms. Upton to adverse actions, but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, yelling, loud noises, and/or aggressive behavior, and the termination of Ms. Upton's employment.

180.     The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Upton's exercising of, or enjoyment of, one or more rights granted by Title VII.

181.     The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Upton.

182.     As a direct and proximate result of the Company's violations of Title VII, Ms. Upton has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

183.     Ms. Upton seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

## COUNT VIII

### (Retaliation in Violation of Conn. Gen. Stat. § 46a-60)

### Ms. Upton v. Defendant

184.    Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

185.    Ms. Upton engaged in protected activity under Conn. Gen. Stat. § 46a-60, including, but not limited to, by voicing protected concerns she was being subjected to sexual harassment and that the Defendant refused to take action to allow her to work in a work place free of sexual harassment in violation of Conn. Gen. Stat. § 46a-60.

186.    Ms. Upton further engaged in protected activity under Conn. Gen. Stat. § 46a-60, including, but not limited to, by voicing protected concerns regarding the sexual harassment, otherwise harassing, and discriminatory actions improperly undertaken by the Company, and by Company employees and agents, including Mr. Chenoweth, Mr. Goldner, Mr. Kurtz, and/or Mr. Troy, based on Ms. Upton's sex, sexual orientation, disability, and/or because she was a homosexual woman, and/or regarding the creation of a hostile work environment through illegal harassment, sexual harassment, and discrimination.

187.    Ms. Upton further engaged in protected activity under Conn. Gen. Stat. § 46a-60, including, but not limited to, by (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Ms. Upton's disabilities; (ii) requesting reasonable accommodations for disabilities which were intended to allow Ms. Upton to perform the essential functions of her job; and/or (iii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the failure of the Company to provide disability-related reasonable accommodations and/or the

failure of the Company to engage in an interactive dialogue related to Ms. Upton's disabilities and requested accommodations.

188. The disability-related accommodation requests which Defendant retaliated against Ms. Upton for requesting included, but were not limited to, (i) not being subjected to aggressive or loud yelling at the workplace.; and (ii) being spoken to in a calm, normal volume due to her diagnosed disabilities, wherein she reacts worse to aggressive behavior or loud noises (such as yelling). The Defendant retaliated against Ms. Upton for engaging in protected activity, including, but not limited to, the aforementioned protected activity, by subjecting Ms. Upton to adverse actions, but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, yelling, loud noises, and/or aggressive behavior, and the termination of Ms. Upton's employment.

189. Defendant's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Upton and/or conduct so reckless to amount to such disregard.

190. As a direct and proximate result of the Defendant's violations of Conn. Gen. Stat. § 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

191. Ms. Upton seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

**COUNT IX**

**(Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.*)**

**Ms. Upton v. Defendant**

192.    Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

193.    Ms. Upton engaged in protected activity under the ADA, including, but not limited to: (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Ms. Upton's disabilities; (ii) requesting reasonable accommodations for disabilities which were intended to allow Ms. Upton to perform the essential functions of her job; and/or (iii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the failure of the Company to provide disability-related reasonable accommodations and/or the failure of the Company to engage in an interactive dialogue related to Ms. Upton's disabilities and requested accommodations.

194.    The disability-related accommodation requests which Defendant retaliated against Ms. Upton for requesting included, but were not limited to, (i) not being subjected to aggressive or loud yelling at the workplace.; and (ii) being spoken to in a calm, normal volume due to her diagnosed disabilities, wherein she reacts worse to aggressive behavior or loud noises (such as yelling).

195.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Upton's exercising of, or enjoyment of, one or more rights granted by the ADA.

196.    More specifically, Defendant subjected Ms. Upton to adverse actions, but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients,

yelling, loud noises, and/or aggressive behavior, and the termination of Ms. Upton's employment.

197.   The Company willfully violated the ADA because the Company knew or should have known its conduct was prohibited by Federal law and/or the Company acted with malice and/or reckless indifference to the federally protected rights of Ms. Upton.

198.   As a direct and proximate result of the Company's violation of the ADA, Ms. Upton has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

199.   Ms. Upton seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, diminished earning capacity, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, interest, attorney's fees, and costs.

### COUNT X

**(Failure to Pay Overtime in Violation of 29 U.S.C. §§ 201 *et seq.*)**

**Ms. Upton v. Defendant**

200.   Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

201.   At all relevant times, the Company was an enterprise engaged in interstate commerce as defined under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (hereinafter, "FLSA").

202. Indeed, the Company has employees engaged in commerce or in the production of goods for commerce, and/or has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for interstate commerce by any person.

203. Furthermore, the Company is an enterprise whose annual gross volume of sales made or business done is greater than or equal to $500,000.

204. At all relevant times, Ms. Upton was an employee who was engaged in interstate commerce or in the production of goods for interstate commerce.

205. Ms. Upton was a non-exempt employee paid in part through commission, but who was not subject to the overtime pay exemption pursuant to FLSA §7(i).

206. Indeed, more than half of Ms. Upton's total earnings in a representative period (of not less than one month) did not consist of commission.

207. Ms. Upton routinely worked in excess of 40 hours per week and, as such, was owed pay for this time.

208. The Company was aware that Ms. Upton was a non-exempt employee and was routinely working in excess of 40 hours per week.

209. The Company knowingly and willfully failed to pay Ms. Upton all overtime pay that she was owed in violation of the FLSA for hours that she worked in excess of 40 hours within a week.

210. As a direct and proximate result of the Defendants' violations of the FLSA, Ms. Upton has suffered and continues to suffer damages, including, but not limited to, lost wages, including lost overtime pay.

211.    Ms. Upton seeks all damages to which she is entitled, including, but not limited to, back pay, liquidated damages for a willful and knowing violation of the FLSA, interest on back pay and the liquidated damages, attorney's fees, and costs.

## COUNT XI

### (Retaliation in Violation of the FLSA – 29 U.S.C. §§ 201 *et seq.*)

### Ms. Upton v. Defendant

212.    Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

213.    The Company is an enterprise engaged in interstate commerce as defined under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (hereinafter, "FLSA").

214.    Indeed, the Company has employees engaged in commerce or in the production of goods for commerce, and/or has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for interstate commerce by any person.

215.    Furthermore, the Company is an enterprise whose annual gross volume of sales made or business done is greater than or equal to $500,000.

216.    Additionally, during all relevant periods, Ms. Upton was an employee who was engaged in interstate commerce or in the production of goods for interstate commerce.

217.    Plaintiff engaged in activity protected under the FLSA, including, but not limited to, by voicing concerns that the Company had not properly paid her overtime and/or that the Company was engaging in improper pay practices.

218.    The Company discriminated against and/or retaliated against the Plaintiff for opposing one or more practices made unlawful by the FLSA, including, but not limited to, by subjecting Ms. Upton to a harassing and otherwise hostile work environment, including but not

limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, and the termination of Ms. Upton's employment.

219.    The Company willfully violated the FLSA and did not have a good faith basis for believing that its actions were not in violation of the FLSA.

220.    As a direct and proximate result of the Defendants' knowing and willing violations of the FLSA by retaliating against Ms. Upton, Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, interest on lost compensation and benefits, liquidated damages, compensatory damages, attorney's fees, and costs.

## COUNT XII

### (Failure to Pay Overtime in Violation of Conn. Gen. Stat. § 31-76b)

### Ms. Upton v. Defendant

221.    Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

222.    The Company is an employer as defined under Conn. Gen. Stat. § 31-58.

223.    The Company employed Ms. Upton.

224.    In violation of Conn. Gen. Stat. § 31-76b, the Company routinely failed to pay Ms. Upton for wages that she was owed for the hours that she worked, including, but not limited to, during the period of time when Ms. Upton was improperly misclassified as a exempt (inside sales) employee and worked overtime hours without receiving proper compensation.

225.    Indeed, Ms. Upton was a non-exempt employee.

226.    Notably, Ms. Upton did not perform a job where her sole duty was to sell a product or service, as she routinely performed alternative (non-sales related job duties),

including, but not limited to, opening the office, disarming the alarm system, taking out the trash, cleaning the office bathrooms, and vacuuming the office floors, for an extensive amount of time.

227. Further, more than half of Ms. Upton's total earnings in a representative period (of not less than one month) did not consist of commission.

228. Ms. Upton routinely worked in excess of 40 hours (but not more than 54 hours) per week but was not paid time and a half or at all for this work.

229. Ms. Upton was not subject to the overtime pay exemption under Con. Gen. Stat. § 31-76(i) regarding inside salesperson.

230. As such, the Company unlawfully failed to pay Ms. Upton time and a half overtime (or indeed at all) for the hours she worked in excess of 40 hours a week.

231. The Company's violation of Conn. Gen. Stat. § 31-76b was intentional and committed with reckless indifference to the rights of Ms. Upton.

232. As a direct and proximate result of the violation of Conn. Gen. Stat. § 31-76b by the Company, Ms. Upton has suffered and continues to suffer damages, including, but not limited to lost wages, including lost overtime pay.

233. Ms. Upton seeks all damages to which she is entitled, including, but not limited to, Ms. Upton, Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, interest on lost compensation and benefits, liquidated damages, compensatory damages, attorney's fees, and costs.

**COUNT XIII**

**(Retaliation in Violation of Con. Gen. Stat. § 31-75(c))**

**Ms. Upton v. Defendant**

234.    Ms. Upton incorporates all paragraphs above and below as if set forth fully herein.

235.    The Company is an employer as defined under Conn. Gen. Stat. § 31-58.

236.    The Company employed Ms. Upton.

237.    Ms. Upton engaged in activity protected under Con. Gen. Stat. § 31-75(c), including, but not limited to, by voicing concerns that the Company had not properly paid her overtime and/or opposing the Company's improper pay practices.

238.    The Company discriminated against and/or retaliated against the Plaintiff for opposing one or more practices made unlawful by the Con. Gen. Stat. § 31-75(c), including, but not limited to, by subjecting Ms. Upton to a harassing and otherwise hostile work environment, including but not limited to, a hostile, harassing, and sexually harassing workplace, the reassignment of clients, and the termination of Ms. Upton's employment.

239.    Ms. Upton seeks all damages to which she is entitled, including, but not limited to, lost wages and overtime, compensatory damages (including, but not limited to, back pay and front pay), liquidated damages (i.e., double damages), other monetary damages, emotional distress damages, interest, attorney's fees, and costs.

WHEREFORE, the plaintiff, Michelle Upon, respectfully requests that this honorable court:

A.  Schedule this matter for trial by jury;

B.  Find the Defendant liable on all counts;

C.  Award the Plaintiff her lost compensation and benefits (including, but not limited to, back pay and front pay), which is in excess of fifteen thousand dollars, exclusive of interest and costs;

D.  Award the Plaintiff other monetary damages, including damages for her diminished earning capacity and injury to reputation;

E.  Award the Plaintiff emotional distress damages;

F.  Award the Plaintiff compensatory damages, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

G.  Award the Plaintiff punitive damages;

H.  Award the Plaintiff liquidated (i.e., double) damages;

I.   Award the Plaintiff her reasonable attorney's fees;

J.   Award the Plaintiff interest and costs;

K.  Award the Plaintiff all other damages to which she is entitled; and

L.  Grant such further relief as is just and equitable.

Respectfully Submitted,

MICHELLE UPTON

By her attorneys,

THE LAW OFFICES OF WYATT
& ASSOCIATES P.L.L.C

Date: 9/25/2020          By: _____

Benjamin J. Wyatt, Bar No ct29994
BWyatt@Wyattlegalservices.com

Timothy J. Brock, Bar No. ct30864
TBrock@Wyattlegalservices.com

Katherine A. Gabriel, Bar No. ct30948
Katherine@Wyattlegalservices.com

The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1112
Facsimile: (603) 685-2868